USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __08/13/2013__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                            :

N.K. AND L.W., *individually and on behalf of J.K.*, :
                            :

          Plaintiffs,      :

                            :      12 Civ. 5038 (JMF)

-v-                         :

                            :      OPINION AND ORDER

NEW YORK CITY DEPARTMENT OF      :
EDUCATION,                   :

                            :

          Defendant.     :
------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiffs N.K. and L.W., individually and on behalf of their minor child J.K., bring this

action against the New York City Department of Education ("DOE") pursuant to the Individuals

with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*; Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794; and Article 89 of the New York State Education

Law, N.Y. Educ. Law § 4400 et seq.  Plaintiffs contend that the DOE failed to provide J.K. a free

and appropriate public education for the 2011-2012 school year.  An impartial hearing officer as

well as a state review officer held otherwise.

      Plaintiffs move for summary judgment, seeking an order reversing the decision of the

State Review Officer; holding that the DOE failed to provide J.K. with a free and appropriate

public education for the 2011-2012 school year; and ordering the DOE to reimburse Plaintiffs for

tuition paid to the Rebecca School, the private school in which they unilaterally placed J.K. for

the 2011-2012 school year.  Defendant cross-moves for summary judgment, arguing that the

DOE offered J.K. a free and appropriate public education.  For the reasons discussed below,

Defendant's motion for summary judgment is GRANTED and Plaintiff's cross-motion for summary judgment is DENIED.

## BACKGROUND

### A.  Legal Framework

"Congress enacted the IDEA to promote the education of students with disabilities." *M.P.G. ex rel. J.P. v. N.Y.C. Dep't of Educ.*, No. 08 Civ. 8051 (TPG), 2010 WL 3398256, at *1 (S.D.N.Y. Aug. 27, 2010).  The statute requires any state receiving federal funds to provide disabled children with a "free and appropriate public education ('FAPE')."  *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012).  To that end, school districts are required to "create an individualized education program ('IEP') for each such child" with disabilities. *Id.* at 175 (citing 20 U.S.C. § 1414(d); *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)).  An IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *R.E.*, 694 F.3d at 175 (internal quotation marks omitted).  An IEP must be "reasonably calculated to enable the child to receive educational benefits."  *Id.* (internal quotation marks omitted).

In New York, Committees on Special Education ("CSEs") — composed of the student's parent or parents, a regular or special education teacher, a school board representative, a parent representative, and others appointed by the local school district's board of education — are responsible for developing IEPs.  *See* N.Y. Educ. Law § 4402(1)(b)(1); *see also Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998).  When doing so, a "CSE must examine the student's level of achievement and specific needs and determine an appropriate educational

program." *R.E.*, 694 F.3d at 175.  To comply with its substantive obligations under the IDEA, a school district must provide "an IEP that is likely to produce progress, not regression." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130). "Should a parent believe that the school district breached these IDEA duties by failing to provide their disabled child a FAPE, the parent may unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, — F.3d —, 2013 WL 3868594, at *1 (2d Cir. July 29, 2013).

"To begin the tuition-reimbursement process, a parent must first file a due-process complaint which triggers an administrative-review process. . . ." *Id.* (citing 20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)).  If a parent files a due process complaint, the school district has thirty days to remedy any deficiencies identified in the complaint without penalty.  *See R.E.*, 694 F.3d at 187-88 (citing 20 U.S.C. § 1415(f)(1)(B)).  If, at the end of this thirty-day "resolution period," the parent feels his or her concerns have not been adequately addressed, the parent can continue with the due process claim. *See id.*  The IDEA then mandates that states provide an impartial due process hearing before an impartial hearing officer ("IHO"). *See id.* at 175 (citing 20 U.S.C. § 1415(f)).  "The three-pronged *Burlington*/*Carter* test, as construed by New York Education Law § 4404(1)(c), governs that hearing." *M.W.*, 2013 WL 3868594, at *1; *see Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12-13 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985).  That test provides that: "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *M.W.*, 2013 WL 3868594, at *1 (internal footnote omitted).  If dissatisfied with the IHO's ruling, either

party may appeal the case to a state review officer ("SRO").  *R.E.*, 694 F.3d at 175 (citing N.Y.

Educ. Law § 4404(2)).  After exhausting administrative remedies through this process, either

party may bring a civil action in state or federal court to review the SRO's decision.  *See id.*

(citing 20 U.S.C. § 1415(i)(2)(A)).

## B.  Factual Background

J.K. was born on February 17, 1999.  (IEP 1).  J.K. has multiple disabilities,[1] including an

absent corpus callosum, hypotonia, and motor apraxia, which result in significant integration and

attentional deficits as well as delays in cognition and language.  (IEP 3; Tr. 39-40).  There is no

dispute that J.K. is thus a "child with a disability," who is entitled to a free appropriate education

under the IDEA, 20 U.S.C. § 1401(3)(A)(i).  (SRO Decision 2).

On February 14, 2011, a CSE convened to develop J.K.'s IEP for the 2011-2012 school

year.  (IEP at 1, 2; SRO Decision at 3).  Meeting attendees included a DOE special education

teacher, who also served as the DOE representative; a DOE school psychologist; a parent

member; an independent neuropsychologist; a social worker from the Rebecca School; J.K.'s

mother; and her attorney.  (IEP 2; IHO Decision 11).  The CSE considered several evaluations of

J.K., including: a 2010 report from the Rebecca School that included individual reports from

each of J.K.'s service providers (DOE Ex. 4, at 5; Tr. 31); an independent psychoeducational

evaluation commissioned by DOE, dated October 29, 2010 (DOE Ex. 7, at 1); a psychological

evaluation commissioned by J.K.'s parents, consisting of three observations between May 29 and

August 23, 2010 (DOE Ex. 6, at 1); and a classroom observation conducted by a special

education teacher on October 14, 2010 (DOE Ex. 5, at 1).  In addition, J.K.'s mother provided

---

[1]      The State of New York defines multiple disabilities as "concomitant impairments (such
as intellectual disability-blindness, intellectual disability-orthopedic impairment, etc.), the
combination of which cause such severe educational needs that they cannot be accommodated in
a special education program solely for one of the impairments."  8 N.Y.C.R.R. § 200.1(zz)(8).

substantial information about J.K.'s functioning and input into the proper educational placement for him.  (*See* Tr. 36-37; DOE Ex. 2).

The IEP developed at this meeting set forth several annual goals and short-term objectives for J.K.  (IEP 6-11).  To meet these goals, the IEP recommended that J.K. be placed in a 6:1:1 classroom — that is, a classroom with six students, one teacher, and one paraprofessional aide, *R.E.*, 694 F.3d at 175 — in a specialized school for certain students with special needs. (IEP 1).  In addition, the IEP recommended a 1:1 crisis management paraprofessional be assigned exclusively to support J.K. through transitions during the day and help ensure that he remained calm and able to learn.  (*Id.* at 12; Tr. 43).  It provided four forty-minute individual speech, occupational, and physical therapy sessions per week, as well as one session per week of each kind of therapy with a peer.  (IEP 14).  The IEP recognized J.K.'s significant sensory needs and recommended sensory supports.  (*Id.*  4-5, 16).  It also provided that J.K. was to have access to music throughout the day.  (*Id.* 4, 16).  Although the IEP did not itself include information on parent training and counseling, J.K.'s mother was informed at the CSE meeting that parent training was available.  (Tr. 44).

The IEP indicates that it was mailed to J.K.'s parents on February 15, 2011.  (IEP 2).  On June 10, 2011, the DOE mailed J.K.'s parents its Final Notice of Recommendation, offering J.K. placement in a twelve-month 6:1:1 class at P226.  (DOE Ex. 3).  On June 17, 2011, J.K.'s parents sent the DOE a letter notifying it that they planned to unilaterally enroll J.K. at the Rebecca School .  (Parent Ex. C, at 1).  J.K.'s mother visited P226 with a social worker from the Rebecca School on June 21, 2011.  (Tr. 415-16).

On July 5, 2011 J.K.'s parents filed a due process complaint requesting an impartial hearing; alleging that the DOE had denied J.K. a FAPE for the 2011-2012 school year; and

seeking tuition reimbursement for their unilateral placement of J.K. at the Rebecca School. (Due

Process Compl. 1). The complaint alleged the IEP was inadequate for nine reasons: (1) The CSE

failed to conduct the triennial reevaluations required under New York law; (2) the CSE failed to

comply with state regulations regarding participation in a CSE meeting by teleconference; (3) the

1:1 paraprofessional the CSE recommended to provide support to J.K. throughout the day was

insufficient; (4) the IEP failed to recommend parent training and counseling; (5) the DOE's

recommended placement at P226 was inappropriate for J.K. because the school was housed with

several other schools, and thus the size of the space and number of students would be

overwhelming for him; (6) P226 lacked the sensory equipment J.K. required; (7) J.K. required

the use of music, and there was no music teacher or music therapist at P226; (8) it was unlikely

that P226 could satisfy the occupational, physical, and speech therapy requirements of the IEP;

and (9) the composition of the class in which J.K. would likely be placed at P226 did not provide

an appropriate peer group. (*Id.* 3-5). Significantly, although the complaint took issue with the

failure of the "proposed IEP" to list parent training and counseling as a related service to which

J.K. was entitled (*id.* 4), it also alleged that the parents had not yet received a copy of the IEP (*id.*

5). The parents therefore purported to "reserve the right to amend th[e] hearing request" to raise

other issues that came to their attention when they received the IEP. (*Id.* 5).

On September 20, 2011, J.K.'s parents filed an amended due process complaint. (Pls.'

56.1 Statement Ex. 1, at 1). The amended complaint alleged that J.K.'s parents had first received

a copy of the IEP on September 19, 2011 and contended that because they had reserved their

right to amend their due process notice, such amendment was proper. (*See id.* at 8). Both the

DOE and the IHO, however, refused to grant permission for this amendment. (*See* Pls. 56.1

Statement Exs. 2, 3).

An impartial hearing was held on the merits of J.K.'s parents' claims over four days in late 2011.  (IHO Decision 5).  The IHO found that the substantive claims lacked merit and that no substantive harm resulted from any procedural violations.  (*See id.* at 13-22).  The IHO therefore concluded that "the program and the site offered would have addressed [J.K.'s] needs and were reasonably calculated to provide educational benefits."  (*Id.* 22).  In addition, the hearing officer held that J.K.'s parents had not demonstrated that the Rebecca School provided J.K. with an appropriate education and denied their request for tuition reimbursement.  (*Id.* 27).

J.K.'s parents appealed the IHO's decision to New York's Office of State Review.  (SRO Decision 5).  The SRO refused to consider any claims that were not raised in the original due process complaint.  (*Id.* at 9).  He concluded that, "[d]espite the parents' claim on appeal that they ha[d] yet to receive a copy of the February 2011 IEP, the evidence compels a contrary conclusion."  (*Id.* at 9 n.1).  Furthermore, the reservation of rights the parents included in their original complaint, the SRO held, could not substitute for the statutory provisions requiring either the DOE or IHO's permission to amend.  (*Id.* at 9-10).  On the merits, the SRO agreed with the IHO that J.K.'s parents' substantive claims failed and that their procedural claims, to the extent that they had any merit, resulted in no substantive harm.  (*See id.* at 10-24).  Having concluded that the DOE offered J.K. a FAPE for the 2011-2012 school year,[2] the SRO declined to address the appropriateness of the placement at the Rebecca School.  (*Id.* at 24).

On June 27, 2012, Plaintiffs filed their Complaint with this Court alleging that the DOE did not offer J.K. a FAPE for the 2011-2012 school year, and therefore the SRO's decision

---

[2]     In its conclusion, the SRO Decision states that that the IHO "found that the district offered the student a FAPE for the 2010-2011 school year," (SRO Decision 24), but it is clear that this is an error and the SRO meant to refer to the 2011-2012 school year.  The opinion analyzes the 2011-2012 IEP and repeatedly refers to J.K.'s educational placement for that year.  (*See id.* at 1, 3, 11-24).

should be reversed.  (*See* Compl. (Docket No. 1) at 10).  Plaintiffs allege that the 2011-2012 IEP

is inadequate for several reasons.  They contend that the CSE had insufficient evaluative

information about J.K. (*see id.* ¶¶ 31, 33); "failed to consider recommending a non-public school

program" (*id.* ¶ 21); did not discuss fully the annual goals contained in the IEP (*see id.* ¶ 32); and

failed to provide J.K.'s parents a copy of the IEP (*id.* ¶ 23).  They also allege that the IEP is

inadequate because it did not specify that J.K.'s educational placement should offer parent

training and counseling (*id.* ¶¶ 19, 39); it "failed to include a clearly effective and appropriate

educational and therapeutic methodology" (*id.* ¶ 20); it included goals that J.K. would have

already achieved by the time it was implemented (*id.* ¶ 32); and it did not recommend music

therapy (*id.* ¶ 35).  Finally, Plaintiffs allege that P226, the school site where J.K. would have

been placed, was inappropriate because its size would overwhelm J.K. (*id.* ¶ 40); placement there

required J.K. to make several transitions throughout the day (*id.*); the school did not offer the

sensory integration services J.K. needed (*id.* ¶¶ 35, 40); and J.K. would have been placed with an

unsuitable group of students (*id.* ¶ 40).

## DISCUSSION

### A.  Standard of Review

Summary judgment motions in the context of the IDEA involve "more than looking into

disputed issues of fact."  *T.P. ex rel S.P.  v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247,

252 (2d Cir. 2009).  Instead, they are a "'pragmatic procedural mechanism' for reviewing

administrative decisions."  *Id.* (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397

F.3d 77, 83 n.3 (2d Cir. 2005).  The Court in such cases conducts an "'independent' judicial

review."  *Walczak*, 142 F.3d at 129 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205 (1982)).

The Supreme Court has explained, however, that conducting an independent judicial review is

not an "'invitation . . . to substitute'" the Court's "'own notions of sound educational policy for those of the school authorities they review.'" *Id.* (quoting *Rowley*, 458 U.S. at 206). The "district court must base its decision on the preponderance of the evidence," but it must also "give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks and brackets omitted). "Deference is particularly appropriate whe[re]," as here, "the state officer's review 'has been thorough and careful,'" *R.E.*, 694 F.3d at 184 (quoting *Walczak*, 142 F.3d at 129).

## B.  Exhaustion

This Court lacks subject matter jurisdiction to consider any claim that has not been exhausted pursuant to the IDEA's administrative review process — that is, it may not consider any issues that were not considered by the IHO in the due process hearing. *See, e.g.*, *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 243 (2d Cir. 2008). The IDEA provides that a party requesting a due process hearing "shall not be allowed to raise issues at the . . . hearing that were not raised in the notice . . . unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B). "A party may amend its due process complaint notice only if . . . the other party consents in writing . . . or . . . the hearing officer grants permission." *Id.* § 1415(c)(2)(E)(i). Here, although Plaintiffs amended their due process complaint, they did so without either the school district's consent or the IHO's permission. (*See* Pls.' 56.1 Statement, Exs. 3-5). Therefore, their initial due process complaint remains the operative complaint; it was the only due process notice considered by the IHO and SRO and is thus the only complaint this Court may consider. *See, e.g.*, 20 U.S.C. § 1415(i)(2)(A) ("Any party aggrieved by the findings and

decision made" in a due process hearing has "the right to bring a civil action *with respect to the [due process] complaint presented*." (emphasis added)); *B.P. v. N.Y.C. Dep't of Educ.,* 841 F.Supp.2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO and this Court, is limited to matters either raised in the Plaintiffs' impartial hearing request or agreed to by Defendant."); *B.M. v. N.Y.C. Dep't of Educ.*, 12 Civ. 3247 (JMF), 2013 WL 1972144, at *5 (S.D.N.Y. May 14, 2013) ("A district court . . . may only review issues raised in a plaintiff's due process complaint.").

Plaintiffs argue that while the lack of consent from the school district and the IHO would ordinarily prevent them from raising claims not contained in their initial due process complaint, in this case, such consent ought to be excused because they were not provided with a copy of J.K.'s IEP until September 19, 2011. (*See* Pls.' Mem. 4-5). As an initial matter, the IHO found that the school district did in fact timely send the IEP to the Plaintiffs on February 15, 2011. (IHO Decision 22). Similarly, the SRO found that "the evidence compels" the conclusion that the Plaintiffs received the IEP. (SRO Decision 9 n.1). The evidence in the record supports this conclusion: The IEP itself indicates that it was sent to the parents on February 15 (IEP 2); the school psychologist testified that the IEP was mailed out and that her partner confirmed that she had sent it (Tr. 80-81); and the psychologist also testified that she had spoken with J.K.'s mother several times, and that J.K's mother had never indicated that she had not received the IEP (Tr. 81). Furthermore, the initial due process complaint suggests that J.K.'s parents had seen some version of the IEP because it alleges that the IEP should have either recommended parent training and counseling or, if the CSE found those services to be unwarranted, noted that conclusion, but the IEP did neither. (Due Process Compl. 4). Had the parents not seen the IEP, they could not have known it was deficient in failing to recommend parent training. The hearing

officers' findings are "well-reasoned and supported by the record," and are therefore entitled to deference. *T.P.*, 554 F.3d at  254 (internal quotation marks omitted); *see also M.H.* 685 F.3d at 258 (holding that because "[t]he IHO's determination was based on his assessment of the credibility of the witnesses testifying before him, . . . . [i]t was entitled to deference").

Even if Plaintiffs had not, in fact, received a copy of the IEP, this Court is without authority to excuse their failure to exhaust.  The Second Circuit has repeatedly held that exhaustion under the IDEA is jurisdictional.  *See, e.g.*, *Cave*, 514 F.3d at 243; *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002); *Hope v. Cortines*, 69 F.3d 687, 688 (2d Cir. 1995); *see also B.M.*, 2013 WL 1972144, at *6 (holding that the Second Circuit's precedent treating failure to exhaust under the IDEA as jurisdictional remains good law).  There are three exceptions to the IDEA's exhaustion requirement: "Congress specified that exhaustion is not necessary if (1) it would be futile to resort to the IDEA's due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; or (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies."  *Murphy*, 297 F.3d at 199.  Plaintiffs do not argue that the failure to provide them with N.K.'s IEP falls within any of these exceptions or that the DOE "opened the door" to their unexhausted claims at the impartial hearing.  *Cf. M.H.*, 685 F.3d at 250.  Nor may they rely on the reservation of rights in their due process notice.  *See B.P.*, 841 F. Supp. 2d at 611.  To consider claims raised for the first time in a due process notice that was amended without the permission of the school district or the IHO based simply on a unilaterally asserted reservation of rights "would impermissibly expand the scope of the review of this Court beyond its statutory authority."  *Id.* (citing 20 U.S.C. § 1415(f)(3)(B); 34 C.F.R. §

300.511(d); 8 N.Y.C.R.R. 200.5(j)(1)(ii).  This Court is thus without jurisdiction to consider any claims not included in Plaintiffs' initial due process complaint.

Plaintiffs raise four claims in their Complaint before this Court that were not raised in the initial due process notice: (1) the CSE's failure to consider recommending a non-public school program (Compl. ¶ 21); (2) the failure of the CSE to discuss fully annual goals for J.K. (*id.* ¶ 32); (3) the IEP's recommendation of annual goals that J.K. would have allegedly achieved by the time the IEP was implemented (*id.*); and (4) the IEP's "fail[ure] to include a clearly effective and appropriate educational and therapeutic methodology" (*id.* ¶ 20).  (As it happens, Plaintiffs make no argument in their memorandum of law in support of the first or fourth claims anyway.)  In addition, Plaintiffs' memorandum of law in support of their motion for summary judgment raises another claim that is not specifically included in the Complaint: They contend that the CSE failed to conduct a Functional Behavioral Assessment (Pls.' Mem. 7).  This allegation was also not raised in the initial due process complaint.[3]  Because these claims are unexhausted, the Court lacks jurisdiction to consider them and will not do so.

**C.  Procedural Adequacy**

Plaintiffs argue that the IEP was both procedurally and substantively inadequate.  While substantive inadequacy automatically entitles parents to reimbursement, procedural violations do so only "if they 'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'"  *R.E.*, 694 F.3d at 190 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).  Plaintiffs allege no violation that meets this standard.

---

[3]      Even if this claim had been raised, it is without merit.  "Failure to conduct an FBA . . . does not render an IEP legally inadequate under the IDEA" where, as here, "the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior."  *M.W.*, 2013 WL 3868594, at *6.

### 1.  Failure to Provide Parents a Copy of the IEP

School districts are required to "ensure that a child's IEP is in effect by the beginning of the school year and that the parents are provided a copy."  *Cerra*, 427 F.3d at 194.  As noted above, Plaintiffs allege that the DOE failed to provide them with a copy of J.K.'s IEP before the start of the school year.  (Compl. ¶ 23; Pls.' Mem. 4).   But also as explained above, the IHO and SRO found that the DOE did indeed mail the IEP to J.K.'s parents, a well-supported finding this Court adopts.

Regardless, any failure to provide Plaintiffs a copy of the IEP did not "impede[ ]" their "opportunity to participate in the decisionmaking process."  *R.E.*, 694 F.3d at 190 (internal quotation marks omitted).  J.K.'s mother was present — with her attorney — at the meeting at which J.K.'s IEP was formulated, and she participated fully in the development of the IEP (*see* IEP 2; Minutes of CSE Meeting, DOE Ex. 2; IHO Decision 11-12); she visited the placement recommended by the District (Tr. 415-16); she corresponded repeatedly with the school psychologist (81-82); and J.K.'s parents commissioned an independent evaluation of J.K. that was considered at the CSE meeting (DOE Ex. 6, at 1).  This level of parental involvement demonstrates that J.K.'s parents had a sufficient opportunity to participate in the decisionmaking process.  *Cf. Cerra*, 427 F.3d at 193 (holding that, despite failing to provide a student's parents a copy of the student's IEP, a school district "fulfilled the [IDEA's] procedural obligations" because the parents "had numerous opportunities to participate in meetings with respect to the identification, evaluation, and educational placement of the child" (internal quotation marks omitted)); *A.E. v. Westport Bd. of Educ.*, 463 F. Supp. 2d 208, 217 (D. Conn. 2006), *aff'd* 251 F. App'x 685 (2d Cir. 2007) (holding that parents had "a meaningful opportunity to participate"

where they were able to attend meetings, were represented by counsel, corresponded with the CSE, and had their child independently evaluated).

## 2. Failure to Recommend Parent Training and Counseling Services

"New York regulations require that school districts offer training and counseling to parents of a child with autism in order to help the parents implement their child's IEP." *E. Z.-L. ex rel. R.L. v. N.Y.C. Dep't of Educ.*, 763 F. Supp. 2d 584, 597 (S.D.N.Y. 2011), *aff'd sub nom. R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012). Nevertheless, "failure to provide counseling ordinarily does not result in a FAPE denial or warrant tuition reimbursement." *M.W.*, 2013 WL 3868594, at *7; *see R.E.*, 694 F.3d at 191 (explaining that "[t]hough the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that failure, standing alone, is not sufficient to" render the IEP inadequate). Especially where the recommended placement actually offers parent training and counseling, the failure to specifically note the availability of such training on a child's IEP does not constitute denial of a FAPE. *See R.E.*, 694 F.3d at 195; *E. Z.-L.*, 763 F. Supp. 2d at 597-98. In this case, not only did the recommended placement provide parent training and counseling, but J.K.'s mother was also informed of this during the CSE meeting. (*See* IHO Decision 15; SRO Decision 20; Tr. 43-44, 99-100, 106). Thus, DOE's failure to confirm the availability of these services on the IEP was a procedural violation that resulted in no actual harm, let alone the denial of a FAPE.

## 3. Failure to Conduct Sufficient Evaluations

Although Plaintiffs do not provide any argument about this point in their memorandum of law, their Complaint before this Court alleges generally that the SRO "incorrectly held that the District had sufficient evaluative information about J.K.'s academic abilities and functional

14

performance so as to permit the IEP team to develop an appropriate program for the 2011-2012 school year" (Compl. ¶ 33). This claim was arguably raised in the due process notice, which contended that the IEP "is defective in that the CSE has not conducted mandated triennial reevaluations." (Due Process Notice 3 (citing 8 N.Y.C.R.R. § 200.4(b)(4)). New York law provides that a CSE "shall arrange for an appropriate reevaluation of each student with a disability . . . at least once every three years." 8 N.Y.C.R.R. § 200.4(b)(4). The law states that students' educational and related services needs ought to be evaluated, but otherwise does not specify what a reevaluation must include. *Id.* The regulations state only that "the reevaluation shall be sufficient to determine the student's individual needs, educational progress and achievement, the student's ability to participate in instructional programs in regular education and the student's continuing eligibility for special education." *Id.*

Plaintiffs' due process notice did not specify which assessments Plaintiffs believe J.K. needed that the district failed to arrange, and, as noted, their memorandum of law does not address this claim at all. This failure constitutes a waiver of Plaintiffs' claims. *See, e.g.*, *Sonera Holding B.V. v. Cukurova Holding A.S.*, 895 F. Supp. 2d 513, 521 (S.D.N.Y. 2012) ("It is well settled . . . that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001)). In any event, to the extent that the Court can discern precisely what Plaintiffs contend was lacking, their claims are without merit. Plaintiffs do not dispute that at the February 2011 meeting, the CSE reviewed a classroom observation of J.K., dated January 14, 2011; a school report, dated December 2010; a psychoeducational evaluation, dated October 29, 2010; and a psychological evaluation conducted May 9, June 9, and August 23, 2010. (IHO Decision 13). Although the CSE did not conduct its own evaluation of J.K.'s needs with respect to related

services — that is "developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education," 20 U.S.C. § 1401(26) — it relied on a December 2010 report from the Rebecca School that evaluated these needs.  (IHO Decision 13-14; SRO Decision 13; DOE Ex. 4).  The IHO and SRO found that these evaluations were sufficient for the CSE to develop an IEP that adequately addressed J.K.'s needs.  (IHO decision 13-14; SRO Decision 13).  Their finding is well reasoned and supported by the record.

### 4.  Cumulative Procedural Violations

Procedural violations must be considered cumulatively.  *See R.E.*, 694 F.3d at 190. "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not."  *Id.*  In this case, Plaintiffs have failed to identify even a single procedural violation that caused any harm.  Therefore, even considered cumulatively, the alleged procedural violations did not result in the violation of a FAPE.

## D.  Substantive Adequacy

In addition to their procedural challenges to the IEP, Plaintiffs also raise several challenges to its substantive adequacy.  "Substantive inadequacy automatically entitles the parents to reimbursement."  *R.E.,* 694 F.3d at 190; *accord M.W.*, 2013 WL 3868594, at *9.  To comply with its substantive obligations under the IDEA, however, a school district "need not maximize the potential of handicapped children."  *M.W.*, 2013 WL 3868594, at *9 (internal quotation marks omitted).  Rather, it need only provide "an IEP that is likely to produce progress, not regression."  *Cerra*, 427 F.3d at 195 (quoting *Walczak*, 142 F.3d at 130).

The Second Circuit has cautioned that "deference [to administrative agencies] is particularly important when assessing an IEP's substantive adequacy."  *Cerra*, 427 F.3d at 195;

*see id.* ("We have not hesitated to vacate district court opinions where the district court erred in substituting its judgment for that of the agency experts and the hearing officer." (internal quotation marks omitted)).  Here, the conclusions of the IHO and SRO that the DOE provided J.K. a FAPE were well reasoned, thorough, and supported by the record.   They therefore warrant deference.  *See M.H.*, 685 F.3d at 241 ("Deference is particularly appropriate when the state hearing officers' review has been thorough and careful." (internal quotation marks and alteration omitted)).

## 1. Grouping

Plaintiffs argue that the classroom into which J.K. would have been placed was inappropriate for him.  (Pls.' Mem. 8-9).  That classroom had four sixth-grade students whose reading and math levels ranged from kindergarten to third grade.  (Tr. 149).  J.K.'s reading and math levels were at a pre-kindergarten level.  (IEP 3).  Plaintiffs argue that the class "lack[ed] appropriate staffing . . . to offer differentiated instruction," and therefore it would have been inappropriate to group J.K. with these higher-functioning students.  (Pls.' Mem. 9).

As an initial matter, in determining the sufficiency of an IEP, although courts may consider evidence "that explains or justifies the services listed in the IEP," it may not consider evidence about how the IEP would have been implemented.  *R.E.*, 694 F.3d at 186.  Thus, while "a school district may introduce evidence explaining how [the 6:1:1] structure operates and why it is appropriate," a court may not consider evidence that, for example, "a child would have had a specific teacher or specific aide."  *Id.* at 187.   Plaintiffs rely upon evidence that J.K. would have been placed in a specific classroom.  But "[a]t the time the parents must decide whether to make a unilateral placement based on the IEP, they may have no guarantee of any particular" classroom.  *Id.*  Therefore, "[t]he appropriate inquiry is into the nature of the program actually

offered in the written plan." *Id.*   Plaintiffs do not object to the IEP's recommendation that J.K. be placed into a 6:1:1 classroom.  Their argument is based solely on the specific classroom into which he would have been placed.  Therefore, the Court may not consider it.

Even if the Court could consider such evidence, the classroom in which J.K. likely would have been placed was appropriate.  New York law requires that group instruction "shall be consistent with the individual needs of each student in the group, and the instruction required to meet the individual needs of any one student in the group shall not consistently detract from the instruction provided other students in the group."  8 N.Y.C.R.R. § 200.1.  In addition, "[t]he range of academic or educational achievement of" students with disabilities grouped together for special education "shall be limited to assure that instruction provides each student appropriate opportunities to achieve his or her annual goals.  The learning characteristics of students in the group shall be sufficiently similar to assure that this range of academic or educational achievement is at least maintained."  8 N.Y.C.R.R. § 200.6(a)(3)(i).  As the IHO found, the DOE has demonstrated "that it could have [provided] individualized and differentiated instruction so as to maintain an appropriate range of academic instruction to provide appropriate opportunities to achieve [J.K.'s] annual goals."  (IHO Decision 21).

New York state regulations provide that a 6:1:1 class is designed for students "requiring a high degree of individualized attention and intervention."  8 N.Y.C.R.R. § 200.6.  Edith Silsdorf, the teacher who likely would have taught J.K., testified that the small class size allowed for "differentiated instruction" tailored to each student, so that "each child was definitely getting the individual attention they needed and were working at their level."  (Tr. 161).  She further testified that J.K. would "[a]bsolutely" have gotten sufficient individual attention.  (*Id.*).  Silsdorf stated that students in her class received individual attention about fifty percent of the time.  (Tr.

159).  In addition, J.K. would have had a paraprofessional working solely with him.[4]  (IEP 7).

Although J.K. was "a little lower [functioning] academically" than the other students in the class,

Silsdorf stated that "he was functioning at about the same level as [those] students" and that "he

would have fit in with . . . instruction that was . . . individually geared to what he needed."  (Tr.

162).  She testified that she would have provided such individualized instruction.  (*Id.* at 163).

The question is not whether the class was "the best possible" class into which J.K. could

have been placed, *E.S. & M.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417,

436 (S.D.N.Y. 2010), *aff'd* 487 Fed. App'x 619 (2d Cir. 2012), but rather whether it complied

with New York regulations, and, with respect to the IDEA, whether J.K. was likely to progress,

and not regress, within the class, *Cerra*, 427 F.3d at 195.  The Court agrees with the IHO's well-

reasoned opinion that this classroom placement would have been appropriate under the IDEA

and New York law.

### 2.  Failure to Present Evidence About J.K.'s Class Placement from September to June

Plaintiffs argue that, when the IEP took effect, the DOE was required to present evidence

at the due process hearing not only about the class in which J.K. would have been placed over

the summer, but also about the class in which J.K. would have been placed during the rest of the

academic year, and in particular that class's grouping.[5]  This contention is meritless.  Plaintiffs

cite no authority for the proposition that the DOE is required to present such evidence.

---

[4]     Plaintiffs allege that the SRO "inappropriately and incorrectly determined that J.K. could
be provided with instructional services by a paraprofessional."  (Compl. ¶ 37 (citing SRO
Decision 16-19)).  But nowhere in his decision does the SRO state that instructional services
should be provided by a paraprofessional.  Instead, he concluded that the 6:1:1 class at P226
would provide adequate individual instruction, and the 1:1 paraprofessional would ensure that
J.K. remained sufficiently calm and attentive to take advantage of that instruction.  (*See* SRO
Decision 18-19).

[5]     The Court notes that although argued in Plaintiffs' memorandum of law, this claim was
not included in their Complaint before this Court.  *See Mahmud v. Kaufmann*, 607 F. Supp. 2d

Although Plaintiffs are correct that the DOE bears the burden of proving the appropriateness of a proposed IEP, *see M.H.*, 685 F.3d at 224, it must only demonstrate that the IEP itself is adequate.  The DOE need not specify the school or classroom in which it will be implemented.  The "educational placement," the adequacy of which the DOE must demonstrate, "refers only to the general type of educational program in which the child is placed." *R.E.*, 694 F.3d 191 (internal quotation marks omitted).  It "does not refer to a specific location or program." *K.L.A. v. Windham Se. Supervisory Union*, 371 Fed. App'x. 151, 154 (2d Cir. 2010) (summary order); Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, 71 Fed. Reg. 46540, 46687 (Aug. 14, 2006) ("The Department's longstanding position is that placement refers to the provision of special education and related services rather than a specific place, such as a specific classroom or specific school.").  The Second Circuit has repeatedly held that there is no requirement that an IEP even identify a specific school site at which an IEP will be implemented.  *See, e.g.*, *R.E.*, 694 F.3d at 191; *T.Y.*, 584 F.3d at 419.  If the DOE need not identify a particular school site, there cannot be a requirement that it provide parents details about the specific group of children with which their child will be placed.  In fact, as explained above, courts are prohibited from evaluating the adequacy of an unimplemented IEP based on evidence about the particular classroom in which a student would be placed.  *See R.E.*, 694 F.3d at 186-87.

In any event, the IDEA and New York law "only require[] that a school district have an IEP in effect at the *beginning* of the applicable school year." *K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, 11 Civ. 3733 (KBF), 2012 WL 4017822, at *16 (S.D.N.Y. Aug. 23, 2012) (citing 34 C.F.R. § 300.323(a); 8 N.Y.C.R.R. § 200.4(e)(1)(ii)).  As explained above, the DOE

_____

541, 555 (S.D.N.Y. 2009) ("Generally, courts will not consider, on a motion for summary judgment, allegations that were not pled in the complaint.").

demonstrated that "as of the first day of school," the IEP "was reasonably calculated to enable [J.K.] to receive educational benefits."  *Id.*  That is sufficient.  *See id.*

### 3.  **Placement at P226**

The DOE may place a student at any school site it chooses, so long as the school can satisfy the requirements of the IEP.  *See R.E.*, 694 F.3d at 191-92; *T.Y.*, 584 F.3d at 420.  The record supports the well-reasoned conclusion of the IHO and SRO that J.K.'s IEP could be adequately implemented at P226.

Plaintiffs argue that P226, the school at which J.K. would have been placed, is inappropriate for him for three reasons.  First, Plaintiffs note that the school is large and "contains several hundred children," and J.K. "tends to get disregulated when around noisy environments."  (Pls.' Mem. 10.)   If placed at this site, Plaintiffs contend, "there would be a lot of time spent trying to calm him down which would waste a lot of his school time."  (*Id.*).  As the SRO noted, this claim is speculative.  (SRO Decision 21).  J.K. never attended P226 and, therefore, it is difficult to determine how he would have reacted.  That said, there is no evidence in the record that being in a large building with many other students would, by itself, cause J.K. to become disregulated.  (SRO Decision 21).  Furthermore, the record demonstrated that although J.K. would have been in a school that shared a building with several other schools, for the most part, the special education students were to be kept separate from the other students.  (*See, e.g.*, Tr. 74, 280).  In fact, the site coordinator for P226 testified that special education students at the school had not had any issues with overstimulation in the cafeteria — the location about which Plaintiffs expressed the most concern (*see* Pls.' Mem. 10) — because, due to the layout of the cafeteria, the special education students are separated from the other students and "don't really see them."  (Tr. 280).  Nevertheless, if J.K. were to become disregulated, the site

coordinator testified, he would be provided a "sensory diet" that could calm him down.  (*Id.*
257).  In addition, the role of the crisis management paraprofessional that the IEP provided
would accompany J.K. throughout the school day was to ensure that J.K. was "in a calm state so
that he's available for learning."  (*Id.* 43).  There is thus substantial evidence supporting the
SRO's conclusion that Plaintiffs' concerns about the size of P226 were unwarranted.  (SRO
Decision 22).

Second, Plaintiffs argue that at P226, "J.K. would be expected to transition to different
teachers throughout the school day which would cause J.K. to get disregulated and lose a great
deal of time trying to get him back."  (Pls. Mem. 11).  This claim, too, is speculative.  The site
coordinator, however, testified that J.K. would likely transition approximately twice per day
during the summer and four times per day during the rest of the year.  (Tr. 273-74).  The record
substantiates the IHO and SRO's conclusion that J.K. would have been able to manage these
transitions.  (IHO Decision 17-18; SRO Decision 22).  In particular, the site coordinator testified
that the school supports students through transitions by providing them with a schedule;
preparing them for transitions in advance; providing verbal prompts during transitions; and
giving them "sensory breaks" when needed.  (Tr. 255-56).  These are precisely the things the
record indicates J.K. would need to function well during transitions.  (*See, e.g.*, Tr. 542, 558-59;
DOE Ex. 4 at 1; SRO Decision 22).  In addition, as noted above, the crisis management
paraprofessional would be able to help ensure J.K. remained calm during transitions.  (Tr. 43,
153).  There is no reason to believe that the transitions J.K. would experience were he to attend
P226 would impede his ability to make progress at that school.

Finally, Plaintiffs contend that the school lacks "the necessary sensory equipment to
allow J.K. to maintain his regulation and gain benefit from his school day."  (Pls.' Mem. 11).

There is no dispute that J.K. "has significant sensory needs." (IEP 16). And Plaintiffs do not argue that the IEP as written fails to meet those needs. Instead, they note that when they visited P226, they "did not see any sensory equipment in the therapy room," and therefore they contend that J.K.'s IEP, which requires such equipment, cannot be implemented at that school. (Pls. Mem. 11-12). But the site coordinator for P226 testified that the school could have implemented the IEP's recommendations for addressing J.K.'s sensory needs. (Tr. 253-54, 256). He further testified that the staff could obtain any sensory materials they might need to adequately do so. (*Id.* at 253-54). "Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *R.E.*, 694 F.3d at 195. The fact that Plaintiffs did not observe any sensory equipment on their site visit is insufficient to demonstrate that P226 lacked such equipment or that the school would not obtain the equipment necessary to implement J.K.'s IEP should J.K. attend the school. *Cf. Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 12 Civ. 2113 (WHP), 2012 WL 6136493, at *7 (S.D.N.Y. Dec. 11, 2012) (deferring to "the SRO's well-reasoned conclusion" that a school site could meet a student's sensory needs despite the fact that an occupational therapy supervisor did not observe the requisite sensory equipment when she visited the site).

### 4. Music Therapy

Finally, Plaintiffs contend that J.K. requires "access to music throughout the school day in order for him to gain an educational benefit" and that the DOE's proposed placement lacks such access. (Pls.' Mem. 12). It is unclear whether Plaintiffs' contention is that P226 could not properly implement the IEP or that the IEP itself is inadequate. The former contention fails for the same reason that Plaintiffs' other attacks on P226 failed: because "[s]peculation that the

school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *R.E.*, 694 F.3d at 195.

The latter contention is similarly meritless. Although the record demonstrates that music therapy was beneficial for J.K. (*see, e.g.*, Tr. 61, 622-27; DOE Ex. 4 at 8-9), it does not support the conclusion that J.K. could not have a FAPE without it. Plaintiffs contend that music therapy is necessary for two reasons: (1) It increases J.K.'s academic, social, and communication skills; and (2) it serves as a motivator. (Pls.' Mem. 12). The IHO and SRO both thoroughly considered the issue and concluded that J.K. did not require music therapy to receive a FAPE. (IHO Decision 19; SRO Decision 19-20). Both officers relied on the testimony of the school psychologist, who stated that the occupational, physical, and speech therapy provided by J.K.'s IEP could "serve him better" — that is, could better aid him "in terms of increasing his ability to function in society" — than music therapy. (Tr. 76). In addition, with respect to J.K.'s use of music for motivation, while the IEP does not provide music therapy, it does recommend that J.K. have "[a]ccess to music throughout the day." (IEP 4, 16). Although J.K.'s parents might prefer J.K. to have music therapy, "[t]he IDEA guarantees only that students with disabilities are provided an appropriate education, not one that provides everything that might be thought desirable by loving parents." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012) (internal quotation marks omitted). The Court agrees with the IHO and the SRO that, while perhaps desirable, music therapy is not necessary to provide J.K. a FAPE. His IEP was therefore adequate.

*****

The preponderance of the evidence thus supports the IHO and SRO's well-reasoned conclusion that J.K.'s 2011-2012 IEP was both procedurally and substantively adequate.

Therefore, the Court need not reach Plaintiffs' claims regarding the propriety of their unilateral placement of J.K. at the Rebecca School.  *See T.P.*, 554 F.3d at 254.  Regardless of the adequacy of the Rebecca School, the DOE need not reimburse Plaintiffs for tuition for the 2011-2012 school year because it offered J.K. a FAPE for that year.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Cross Motion for Summary Judgment is GRANTED.  The Clerk of Court is directed to terminate the motions and close this case.


SO ORDERED.

Dated: August 13, 2013
       New York, New York

_____
JESSE M. FURMAN
United States District Judge